[No. 3254–0–III.   Division Three.   December 9, 1980.]

FRANKLIN COUNTY SHERIFF'S OFFICE, *Appellant,* v. BETTY P. SELLERS, ET AL, *Respondents.*

*C. J. Rabideau, Prosecuting Attorney,* and *George E. Heidlebaugh, Deputy,* for appellant.

*Morton M. Tytler,* for respondents.

*Ivan C. Rutledge,* amicus curiae.

GREEN, C.J.—Franklin County appeals a judgment awarding damages for discriminatory employment practices, in violation of RCW 49.60.180. We reverse.

On June 21, 1974, Betty Sellers, who was working toward

a master's degree in guidance and counseling, learned there was an opening for a work release counselor in the Franklin County Sheriff's Office. She telephoned the sheriff's office and informed Shirley Billingsley, who was the director of the work release program and the only counselor, that she wanted to apply for the position. Mrs. Billingsley confirmed that a counselor position was available, but added that the present need was for a male counselor. Mrs. Billingsley suggested she fill out an application in the event a future position became available. Instead of making an application, Mrs. Sellers filed a complaint with the Washington State Human Rights Commission, alleging discrimination in employment based on sex. A tribunal of the Commission found that limiting the available counselor position to a male was discriminatory and was not a bona fide occupational qualification (BFOQ) exempt from the act. Mrs. Sellers was awarded, in addition to other relief, $7,200 representing the amount she would have received had she been employed by the County. The County appealed the Commission's order and the Superior Court affirmed. This appeal followed.

The County contends the tribunal and then the court erred in finding (1) there was no evidence that women as a class could not perform the functions of a work release counselor, and (2) employment of a male counselor was not necessary for the successful implementation of the County's work release program. Since the resolution of these issues is a mixed question of law and fact, we will exercise our inherent and statutory authority to make a de novo review of the record independent of the Commission's decision. RCW 34.04.130(6)(d); *Daily Herald Co. v. Department of Employment Security*, 91 Wn.2d 559, 588 P.2d 1157 (1979).

Our state law against discrimination is found in RCW 49.60 and is patterned after Title 7 of the United States Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* The federal act and the decisions construing it are persuasive authority for the construction of our state act. RCW

49.60; *Ellingson v. Spokane Mortgage Co.,* 19 Wn. App. 48, 54 n.5, 573 P.2d 389 (1978).[1]

The BFOQ exemption is found in RCW 49.60.180:

> It is an unfair practice for any employer:
> (1) To refuse to hire any person because of such person's . . . sex . . . *unless based upon a bona fide occupational qualification* [BFOQ] . . .

(Italics ours.) The act does not define "BFOQ". However, the Human Rights Commission, in WAC 162–16–020(2), has recognized that the BFOQ exemption may apply:

> (a) Where a person's . . . sex . . . will be essential to, or will contribute to, the accomplishment of the purposes for which the person is hired.

By comparison, the federal act, in 42 U.S.C. § 2000e–2(e) (1976), defines BFOQ as an employment practice that is

> reasonably necessary to the normal operation of that particular business or enterprise . . .

It is evident that the Commission defines BFOQ as something less than "necessary" but more than merely "contributing to" the purpose for which a person is hired. Since the federal act was used as a guide in writing our state law, we conclude the two definitions are essentially synonymous.

■ The issue presented, then, is whether limiting the available counselor position to male applicants was "reasonably necessary" to the successful operation of the work release program in Franklin County. The County has the burden of proving the exemption. *Rose v. Hanna Mining Co.,* 94 Wn.2d 307, 311–13, 616 P.2d 1229 (1980).

Mrs. Billingsley, director of the Franklin County work release program, testified that she was employed as a counselor in the sheriff's office in 1972. The purpose of the

---

[1]Further, WAC 162–30–010 states:

"In the interest of consistency and to avoid confusion on the part of persons governed by both the state and federal sex discrimination laws, the commission will generally follow interpretations of the sex discrimination provisions of Title VII of the United States Civil Rights Act of 1964, 42 USC § 2000e and following, where the federal act is comparable to the state act." *See Lindsay v. Seattle,* 86 Wn.2d 698, 708, 548 P.2d 320 (1976).

counseling position was to help inmates decide what kind of jobs or educational training was needed to assimilate them into the community. To this end, she counseled the inmates, arranged for employment interviews or training programs, and transported the female inmates for the purpose of completing those arrangements. When further mental health counseling was needed, or medical or dental care was required, she arranged for an appointment and then transported the female inmates to the appropriate place. As part of her duties, she often searched the female inmates for contraband upon their return from work.

When Mrs. Billingsley was first employed, she worked with a male counselor. He performed the same duties with respect to the male inmates as she performed for the female inmates. In 1974, the male counselor departed and Mrs. Billingsley became the director and only counselor. She had to refer males to the mental health center for counseling when her sex prevented her from establishing an adequate rapport with them. Further, she could not search the male inmates, transport them to interviews, the mental health center, the doctor or dentist. As a result, the male jailers and others were required to perform many of the functions of the male counselor. She testified that because of the work load, she could have used the help of either a man or a woman counselor; however, a male counselor would have been more beneficial to her and to the needs of the inmates.

Charles Pierson, Jr., who was responsible for the Columbia Mental Health Center's jail services counseling project, confirmed the need for a male counselor at the Franklin County jail. The Center, which was not a county organization, offered to assist the sheriff's office and, consequently, Mr. Pierson counseled Franklin County inmates during 1975–77. Because Mrs. Billingsley was the only counselor, Mr. Pierson counseled many male inmates for work release purposes. He explained the reason for his involvement:

> There was a good number of clients, and Shirley [Billingsley] needed my support or the other male counselors'

support that was available at that time in order to work with these individuals. Many of the people in jail are very much unskilled as relating to people in general, and many of those manipulative and concealing when they deal with a woman. So it was *necessary* in many cases, for Shirley to refer mostly males to myself . . .

(Italics ours.) He stated that the establishment of a relationship with an inmate is a crucial part of the counseling process.

the actual process is one of establishment of a relationship with an individual. That's the required beginning, unless you can interact with a person . . . you can't possibly hope to help him change. Once that relationship is established, then, you can work at a process of confronting an individual with his maladaptive or unsuccessful or illegal behavior. That, then, gives you the end and the opportunity to work towards the behavior change in the person.

He further testified that when "a person is not revealing all that's going on with them [sic] and is not dealing with the issues that are important to them [sic]", the person may not be relating to the counselor because of his or her sex. He concluded:

In some cases, it's possible for a female to relate to some female[s] and impossible for a female to relate to some male[s], just as I cannot be all things to all clients. There are some clients that I can't relate to . . . because of my sex.

After noting that the inmate population was 90 percent male and 10 percent female, Mr. Pierson commented that "in some ways it is more desirable to have a male than a female running the program."

When asked upon cross–examination whether in his opinion a male was only preferable to the program, Mr. Pierson testified an additional female could not service the program as effectively as a male. The Center's jail services project always provided for female and male staff and he believed the dynamics of the Center's counseling program were the same as the work release program. In his opinion,

to hire an additional female counselor in the sheriff's work release department would create a redundancy.

Dr. William D. Sherman, a physician and psychiatrist at the Columbia Mental Health Center, who was familiar with the Franklin County work release program, supported the views expressed by Mr. Pierson. He expressed a very strong opinion supporting the validity of the sheriff's request for a male counselor to balance Mrs. Billingsley. He testified:

> There are profound advantages to having a member of . . . each sex on a staff of this type. There are several reasons for this. . . . Human beings relate differently to males and females, sometimes for better and sometimes for worse. . . . In the course of growing up many of us relate much better to one sex than the other in a counseling way. . . . I think it is necessary to have a member of both sexes available because the work release program depends heavily on the counseling that goes on and the guidance that goes on from the staff to the people in the program. Many people grow up without an adequate male or female model of what it's like to be a competent and happy person of their own sex making out in the world, and I think that idea of a staff should be provided and modeled to both male and female people that are in the work release program. This is a part of the counseling help that can go on in a program like this. . . .
>
> It's my opinion that the *program would be seriously impaired* if both counselors were of the same sex no matter which sex. The evidence of this is drawn of literature . . . people are helping others to expand their lives. Get rehabilitated. The program is better with mixed sex staffs . . . It is true of the group therapy groups that they do better if the two therapists are of opposite sex. The programs do better with mixed staff on the counseling, mixed sex. . . .
>
> I would strongly support that both sexes be represented and the staff not consist of either two females or two males.

(Italics ours.) It was his view that if the only qualified applicant was a woman, only temporary arrangements should be made and the position should be left open until a qualified male became available. He stated, "I would certainly not want to get locked into a position with two

members of the same sex indefinitely running a program like this." He conceded that Shirley Billingsley had operated a good program during the time she had been alone. However, he observed ". . . the program has been hurt. I feel, the program could have been more successful with a competent male working with Mrs. Billingsley . . . over the last three years."

Lane Merryman was the supervisor for the Tri–Cities work training release program for the State of Washington in Pasco. He generally echoed the views of Mr. Pierson and Dr. Sherman. He believed a male and female counselor would make the work release program more successful.

Ray Messegee, director of the adult correction division for the Department of Social and Health Services, testified on behalf of Mrs. Sellers. In his opinion, there was no scientific way to evaluate the extent to which one sex or the other contributes to a successful counseling relationship. Consequently, he concluded that sex is not a significant factor in the counseling situation; it is merely one of many factors. Notwithstanding, he testified that in hiring counselors in his department, he instructed his staff to make every attempt to equalize the numbers of each sex. As a result, the number of males and females was about equal and either sex was available for a counseling assignment as needed.

Sheriff Boyles expressed his needs to the Human Rights Commission in a letter dated July 11, 1974:

> Just recently E.E.A. provided funds enabling this department to hire one or more employee for this [work release] section. It is my feeling that this employee should be a male since there are times that a male cannot communicate with a person of the opposite gender, and that the male prisoners on work release are much greater than the amount of females we have on work release.
>
> When the funds became available for this opening, I instructed the Work Release Director to screen all male applicants leaving the final decision to myself as to who would be hired. I, at this time, still feel this position should be filled by a male counselor.

These needs are also reflected in the statement of purposes and objectives of the work release program, approved by three superior court judges and the work release director. It states: "The staff is comprised of the Program Director and two counselors, a male and female."[2] Further, the need for a sexual balance in the staff was supported by Deputy Prosecuting Attorney Lawrence Moore who worked closely with the program.

Mrs. Sellers contends this evidence did not establish that restricting the position to a male counselor was a BFOQ, but shows only that hiring a male counselor was a preference or convenience. She argues the County must prove that all or substantially all women would be unable to efficiently perform the counselor duties, *Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228, 235 (5th Cir. 1969),[3] and the essence of the operation would be undermined by hiring a woman. *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 388 (5th Cir.), *cert. denied*, 404 U.S. 950, 30 L. Ed. 2d 267, 92 S. Ct. 275 (1971). We agree with the general rules set forth in these cases. However, we find them to be factually distinguishable because they involve restrictions limiting a job category to one sex or class exclusively.[4] Here, the County did not limit the two counselor positions to one sex, but sought to achieve a balance

---

[2]The program description indicates the female would perform secretarial duties in addition to counseling. The addition of secretarial duties is not a problem here. As the program developed, the female became the program director and the sole counselor. The facts do not show, nor do the parties argue, that the employment practices were discriminatory on this basis.

[3]*Cf. Rose v. Hanna Mining Co.*, 94 Wn.2d 307, 311–13, 616 P.2d 1229 (1980) (epileptic handicap).

[4]*Weeks v. Southern Bell Tel. & Tel. Co.*, *supra*, involved a restriction due to physical requirements of a job, and *Diaz v. Pan Am. World Airways, Inc.*, *supra*, involved a restriction to female flight cabin attendants. *See also Rosenfeld v. Southern Pac. Co.*, 444 F.2d 1219 (9th Cir. 1971) (physical requirements); *LeBlanc v. Southern Bell Tel. & Tel. Co.*, 333 F. Supp. 602 (E.D. La. 1971) (limitation upon hours women could work); *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194 (7th Cir.), *cert. denied*, 404 U.S. 991, 30 L. Ed. 2d 543, 92 S. Ct. 536 (1971)

by providing both a female and male counselor to better meet the psychological needs of the inmates. Consequently, the cases are not helpful. However, even if those cases were applicable, we are convinced the restriction imposed here is within the BFOQ exception as defined by *Weeks* and *Diaz*.

The court in *Diaz, supra* at 389, observed that the Equal Employment Opportunity Commission's guidelines, 29 C.F.R. § 1604.1(iii) (1979), state the refusal to hire an individual because of the preference of coworkers, the employer or clients is not a BFOQ. However, the court also stated that a preference would be valid if a company would be unable to perform its primary function or the service it offers unless the limitation is imposed.

Here, the essence or purpose of the counseling position is rehabilitation of people. It is important that the counselor be able to relate to an inmate in such a way that the inmate will freely and openly discuss employment interests and be susceptible to motivation toward obtaining or training for a job and then succeeding in the chosen area. The need for a male–female balance in the two counseling positions was strongly confirmed by the counselors and the psychiatrist who testified for the County. Even Mrs. Billingsley's testimony showed that she believed a male counselor was reasonably necessary to fulfill the primary purpose of the program. Although there is testimony that Mrs. Billingsley was doing an excellent job as a counselor, she testified that because of her sex she had to refer male inmates to the Mental Health Center for work release counseling. Moreover, she had to enlist the aid of others not involved in the program to perform her other duties. Consequently, Mrs. Billingsley was unable to perform the primary functions required by the program in providing counseling, transportation and security for *all* the inmates. Since the program

---

(limitations to unmarried females or termination of pregnant females); *Dothard v. Rawlinson,* 433 U.S. 321, 53 L. Ed. 2d 786, 97 S. Ct. 2720 (1977) (restriction to male prison security guards). Similar restrictions to job categories may be found in 12 A.L.R. Fed. *Employment—Sex Discrimination* § 21, at 104 (1972).

provided for only two counselors, the addition of another female counselor would perpetuate these deficiencies. An all–female counseling staff could not efficiently perform the duties and would thus undermine the essence of the program. *See Philadelphia v. Human Relations Comm'n*, 7 Pa. Commw. 500, 300 A.2d 97 (1973) (juvenile detention facility supervisors).

The Human Rights Commission, in WAC 162–16–020(2), while recognizing that the legislature has not defined BFOQ, stated: "Its meaning must be worked out through experience in administering the law and with reference to the general purposes of the law against discrimination and other expressions of public policy." There is a strong public interest in rehabilitating people so they may be constructive citizens. Every effort should be made to achieve this goal. Considering the entire record, we find that providing a sexual balance of both a female and a male counselor is not only preferable, but is reasonably necessary to the rehabilitation of the Franklin County inmates and the success of the work release program. In this context, the record supports the conclusion that all or substantially all women could not fulfill the purposes of the program. Therefore, limiting the second position to a male counselor is a bona fide occupational qualification exempt from the act.

Reversed.

ROE, J. (concurring specially)—I concur in the analysis and result of Judge Green's opinion.

I state, as an additional reason why this case should be reversed, as follows:

Assuming Betty Sellers established a prima facie case of discrimination which does not come within the BFOQ exception, I would find it necessary to address the issue of damages. The trial court and the tribunal awarded Sellers $7,200 in back pay representing the wages she would have earned from June 21, 1974, through June 18, 1975. Back pay is a well recognized remedy in order to "make whole" the person who has suffered discrimination. Generally, good

faith or lack of intent is no defense. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 45 L. Ed. 2d 280, 95 S. Ct. 2362 (1975). Nevertheless, under the Civil Rights Act of 1964, Title 7, an employer does have a defense from liability if he relied on any written interpretation or opinion of the Commission. 42 U.S.C. § 2000e–12(b) (1974), reads in part:

In any action or proceeding based on any alleged unlawful employment practice, *no person shall be subject to any liability* or punishment for or on account of (1) the commission by such person of an unlawful employment practice if he pleads and proves that the act or omission complained of was in good faith, in conformity with, and *in reliance on any written interpretation or opinion of the Commission, . . .*

(Italics mine.) *See Albemarle Paper Co. v. Moody, supra* at 423 n.17.

I note that under our state statute or regulations, no immunity from liability exists. However, I also observe that the Human Rights Commission does absolve one from liability for reliance on the opinions of the executive secretary of the Human Rights Commission and the declaratory rulings issued by the Commission. WAC 162–04–070(5); WAC 162–08–700(8). I believe such reliance should also extend to the Commission's regulations which are published and on which an individual has a right to rely. *See Rosenfeld v. Southern Pac. Co.,* 519 F.2d 527 (9th Cir. 1975); *Schaeffer v. San Diego Yellow Cabs, Inc.,* 462 F.2d 1002 (9th Cir. 1972); *Rosenfeld v. Southern Pac. Co.,* 444 F.2d 1219 (9th Cir. 1971); *Stryker v. Register Publishing Co.,* 423 F. Supp. 476 (D. Conn. 1976); *LeBlanc v. Southern Bell Tel. & Tel. Co.,* 333 F. Supp. 602 (E.D. La. 1971), *aff'd,* 460 F.2d 1228 (5th Cir.), *cert. denied,* 409 U.S. 990, 34 L. Ed. 2d 257, 93 S. Ct. 320 (1972). Even if Betty Sellers had proved sex discrimination, the damage portion of the judgment against Franklin County would be inappropriate. Because Franklin County believed a male would contribute to the accomplishment of its counseling program and hiring a male would come within the existing BFOQ exception, no back

pay award should be granted under any disposition of this case.

MUNSON, J. (dissenting)—I believe the Franklin County Sheriff's Office has failed to meet its burden of factually proving it was reasonably necessary to hire a man to fill the position for which Betty Sellers applied. Furthermore, the majority incorrectly applies the law defining a bona fide occupational qualification (BFOQ) to this fact situation.

By discussing a BFOQ defense, the majority admits discrimination occurred. A BFOQ can exist only to justify an act of discrimination. Betty Sellers inquired about the position and was told that no women were to be hired; the fact that she took no further steps to apply is irrelevant. *Arnett v. Seattle Gen. Hosp.*, 65 Wn.2d 22, 395 P.2d 503 (1964); *see also Pittsburgh Press Co. v. Pittsburg Comm'n on Human Relations*, 413 U.S. 376, 37 L. Ed. 2d 669, 93 S. Ct. 2553 (1973); *Hailes v. United Air Lines*, 464 F.2d 1006, 1008 (5th Cir. 1972); *Gillin v. Federal Paper Board Co.*, 479 F.2d 97 (2d Cir. 1973). Sellers has made a prima facie case. The burden has shifted to the County to show a legitimate, nondiscriminatory reason for rejecting her. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); *Rose v. Hanna Mining Co.*, 94 Wn.2d 307, 311–13, 616 P.2d 1229 (1980).

The first issue upon which I differ from the majority is the nature of the job for which Sellers applied. The majority has selected testimony which supports its view. There is other evidence which supports the contrary view, adopted by the trier of fact. The statement of purposes and objectives of the work release program, approved by the superior court judges and the work release director stated:

The staff function is as follows:
1. Screen and select participants.
2. Counsel and provide assistance *from community resources in specific fields of mental hygiene treatment.*
3. Determine means for educational and occupational training.

4. Develop and maintain records and provide participant progress reports.
5. Establish participant's financial program and maintain financial records concerning earnings and disbursements.
6. Coordinate and establish communication lines between all departments associated with the program.
7. Promote community understanding and acceptance.

(Italics mine.) The document also states the objectives of the work release program:

1. To provide counseling and training to promote understanding and motivation for the potential fulfillment of healthy attitudes, and
2. To implement employment for economic responsibility, and to meet financial obligations.
    . . .
The primary purpose of the aforementioned objectives, is to help prepare the participant to live in society with the respect and security for self, family and community.

Finally, under the section giving a program description for staff and function, the document stated:

The staff is comprised of the Program Director and two counselors, a male and a female. The female counselor will be responsible for secretarial duties in addition to her counseling activity. . . .

Shirley Billingsley, the current director of the work release program in Franklin County, indicated the job involved "job counseling." She testified she performed the bookkeeping and secretarial duties for the program, provided transportation and occasionally searched returning program members. Billingsley testified she did not do mental health counseling; when that was required she referred men and women to outside mental health counselors such as Chuck Pierson, who argued strongly for a male counselor.[5]

---

[5]Pierson apparently would not have hired a woman under any circumstances. When asked if he would hire a more qualified woman, he said "skills are something that we can train people to acquire. We can't get people to change their sex." Transcript of Human Rights Commission hearing at 235, lines 15–17.

The majority isolates three areas where, because of the predominantly male prison population, a female counselor would be unable to perform the job. Two of these, the need to transport prisoners and perform strip searches, are insignificant[6] aspects of the job and at best inconvenience a female counselor. The real thrust of the majority opinion is that the type of counseling involved requires a male rather than a female because some male inmates do not "relate well" to female counselors. This was primarily the testimony of Mr. Pierson, in whose opinion some 10 percent of the male population of the prison might not "like" a female counselor. Pierson suggested the program worked less well having only a female counselor. But how much so—how far short it fell of its basic goal—he did not say. Nor does he say that those who cannot relate to a counselor are entirely deprived of benefit—he says only that it is easier to help these people, without sex barriers being a·problem. Contrary to Pierson's testimony is that of Ray Messegee, director of the adult corrections division for the Department of Social and Health Services. He feels, based upon research and 18 years of experience, that sex makes absolutely no difference in a counseling setting. Although the counselors hired for his programs have tended, overall, to average half male and half female, from the beginning his program hired work release counselors without regard to sex. In fact, in one work release setting—the city jail in Pasco—there were eight female counselors and no males at all, to deal with an all–male inmate population.

Lane Merryman, supervisor of the Pasco work release program, said he felt a male would be helpful to the program, but concluded he would certainly hire a woman if there were no equally qualified men. And perhaps the most damaging of all is the testimony of Sheriff Boyles of Franklin County. Boyles is ultimately responsible for hiring

---

[6]Nothing in the job description signifies searching prisoners is within the classification of this position. Query: If a prisoner is unsafe to transport, is the prisoner safe enough to be in a work release program?

counselors in the work release program in Franklin County. Although he wanted to hire a man, Boyles admits Shirley Billingsley has run the program, by herself, for 4 years and has done an excellent job. Boyles said that if male applicants for the other position had been less qualified, he might well have hired Sellers. In fact, he said he might have hired her if he had only seen her application, because he never expected to attract anyone, male or female, with her qualifications.

There is a considerable difference of opinion as to the desirability and necessity of having a male counselor to complement Shirley Billingsley. I suggest the original trier of fact was best suited to make this determination. The Human Rights Commission found against the County; we should give its decision respect, as we would any trier of fact.

The majority states that as a practical matter the definition of a BFOQ under WAC 162–16–020(2)(a) is equivalent to 42 U.S.C. § 2000e–2(e) (1976). However, the logical result of concluding the two definitions are equivalent is that the federal tests for a BFOQ should control exclusively. The majority uses a somewhat softer interpretation, somewhere between "strict necessity" and "contributing to," but leaning toward "contribute to." Nonetheless, the language in WAC 162–16–020(2)(a) is written in the alternative, "essential to, or will contribute to". This language is far broader than permitted under the federal definition of a BFOQ. Because of the parallel nature of the state and federal statutes, definitions under the state statute, RCW 49.60, are controlled by the breadth of the United States Civil Rights Act of 1964, Title 7, 42 U.S.C. § 2000e (1976). *Rose v. Hanna Mining Co., supra; Ellingson v. Spokane Mortgage Co.,* 19 Wn. App. 48, 54 n.5, 573 P.2d 389 (1978). *See also* WAC 162–30–010. The Human Rights Commission relied exclusively upon federal law. Furthermore, the Commission made no attempt to defend its regulation defining sex discrimination. I would hold WAC 162–16–020(2)(a) is overbroad and should be changed to reflect the current

status of federal law; state laws cannot stand if they impede, burden or frustrate the purpose of Title 7. *Lindsay v. Seattle,* 86 Wn.2d 698, 708, 548 P.2d 320, *cert. denied,* 429 U.S. 886, 50 L. Ed. 2d 167, 97 S. Ct. 237 (1976).

The majority distinguishes the federal test for BFOQ in *Weeks v. Southern Bell Tel. & Tel. Co.,* 408 F.2d 228, 235 (5th Cir. 1969) (weight lifting limitations) and *Diaz v. Pan Am. World Airways, Inc.,* 442 F.2d 385, 388 (5th Cir.), *cert. denied,* 404 U.S. 950, 30 L. Ed. 2d 267, 92 S. Ct. 275 (1971) (rejecting argument that all–female airplane cabin attendants better "reassured" passengers and demonstrably improved average performance), because those cases dealt with restrictions limiting a job category exclusively to one sex, whereas Franklin County sought a male–female balance in the two positions. If one assumes that sexual balance of any two positions is desirable, hiring only a man to fill the second position when the first was filled by a woman is logically necessary. But making that initial assumption begs the question. The decision to have sexual balance in any two positions is itself a discriminatory decision, subject to scrutiny under *Weeks* and *Diaz.*

Therefore, the better analysis of the action of Franklin County is whether under *Weeks v. Southern Bell Tel. & Tel. Co., supra,* all, or substantially all, 2–woman counseling teams would be unable to perform their required functions; or whether under *Diaz v. Pan Am. World Airways, Inc., supra* at 388, the *essence* of the operation would be undermined by hiring all–female counselors. *See also Dothard v. Rawlinson,* 433 U.S. 321, 53 L. Ed. 2d 786, 97 S. Ct. 2720 (1977); *Rose v. Hanna Mining Co., supra.*

The majority opinion speaks only to Equal Opportunity Commission Guidelines found at 29 C.F.R. § 1604.2(a)(iii) (1979), which deal with preferences of clients. It argues the preference of clients in this case is so important as to make the function of the work release program impossible without mixed–sex counseling. This relates most closely to the "essential function" test of *Diaz.* Yet, as noted, at best only 10 percent of male inmates are unable to relate to female

counselors; and the County was unable to provide testimony that indicated the essential purpose of the program would fail because of this; or that work release participants were unable to find jobs.

The fact that Sheriff Boyles would have hired Sellers if no equally qualified male were available recognizes the program could be carried on with only female counselors. The essential functions of the program were to find jobs and counsel inmates in dealing with the real world. No testimony suggested the program was failing of this purpose for want of a male counselor. The testimony suggested the program might run somewhat better with a male counselor—that it would be more convenient to the prison staff—not that it failed.

Therefore, under the narrow view imposed by federal law, I would find WAC 162-16-020(2)(a) invalid and I would find no BFOQ.

Notwithstanding, I would be inclined to apply this decision prospectively. As noted in Judge Roe's concurring opinion, the County had the right to rely upon what I consider an invalid regulation. I would award Sellers nominal damages and modify the other sanctions imposed by the Human Rights Commission—that Sellers is to be given for 1 year (rather than 2 years as awarded by the Commission) a first option on any job opening in Franklin County for which she is qualified.

Finally, the County, and amicus, argue that the Human Rights Commission is an illegal tribunal. This argument was rejected in *Rody v. Hollis,* 81 Wn.2d 88, 500 P.2d 97 (1972).

Based on the foregoing, I would affirm the actions of the Human Rights Commission except as to damages.

Reconsideration denied February 10, 1981.

Review granted by Supreme Court April 23, 1981.